### MERRIMACK.

---

### STATE *v.* CONCORD RAILROAD *& a.*

Corporate power to build and operate a railroad does not include incidental authority to assume a share of all the accidental losses happening in the through business of a connecting road.

COMPLAINT, of John H. Pearson, E. S. Nutter, and Charles C. Pearson against the Concord Railroad Corporation and its directors, alleging a violation of the injunction granted in *Burke* v. *Concord Railroad*, 61 N. H. 160. June 22, 1882, an order was made in relation to pleading and evidence.

*Bingham & Mitchell* and *W. J Copeland*, for the state.

*W. L. Foster, J. H. George*, and *Jeremiah Smith*, for the defendants.

DOE, C. J.   By a decree made in pursuance of the decision in *Burke* v. *Concord Railroad*, 61 N. H. 160, the directors of the Concord Railroad Corporation were enjoined not to operate the road or manage the business of the Concord company under the general partnership contract of August 19, 1881, and to operate the road and transact the business of the company themselves, in accordance with its charter and the law as held in the decision, and not in partnership with the Lowell, or any other corporation or person.   A reasonable time having been given for changing the general partnership into such a business connection as the court held it to be the duty of the companies of the line to make, the contract of August 19, 1881, was rescinded, and such a business connection, commencing May 1, 1882, was formed, as the defendants, under advice of counsel, understood was held in the decision to be authorized by their charter and other laws of the state. The complainants contend that this connection was a violation of the injunction.   In a supplemental answer, the defendants say this connection was rescinded and abandoned on the 28th day of February, 1883.   But the question still remains whether it was a violation of the injunction.

On the complainants' motion, an order was made limiting the testimony to the proof of facts bearing on the question, How has the Concord been operated since the injunction took effect?   Under this restriction, the parties necessarily had leave to furnish with their evidence statements of other facts, which, being regarded by them as material, they might offer to prove.   The defendants are entitled to an opportunity to prove other facts, if they have offered to prove any that are material; and the complainants have the burden of proving the alleged violation of the injunction.

It is not proved that in the business connection of May 1, 1882, the two companies jointly worked the whole line, or that either of them jointly or severally worked the road of the other.   It is proved that in this respect the defendants have fully complied with the injunction by retaining and exercising exclusive control of the road and business of the Concord company.   The person whom they employed as manager in working the Concord road was also employed by the Lowell as manager in working the Lowell road.   He was appointed manager of each, in pursuance of a mutual understanding of the companies that each would appoint him.   Such an arrangement is consistent with, and apparently tends to promote, the interests of the stockholders and the public. Its legality was considered in the decision to which the injunction refers, and is not a matter of doubt.   Each of these companies has

corporate power to employ the same person as manager of the work of each, and to employ the same persons in other capacities, as the agents and servants of each, so far as they can properly do the work of their respective employers. Each of two corporations has the same right to do this that each of two natural persons— mechanics, merchants, or farmers—has to do the same thing. The distinction to be observed is between an unauthorized joint employment of an agent, by two companies as joint principals, in work which they are not authorized as joint principals to do, and an authorized several employment of the same person, by each, in those parts of the same work which each is authorized severally to do. The legal distinction, in some contingencies, would be practically important; and these complaining stock-holders are entitled to have it enforced with the rigor of the law that maintains the beneficiary rights of trust property.

The running of some through trains, or through cars, for passengers and freight, on some highway between Boston, Concord, and places further north, is required by public convenience; and it is not legally necessary that the engines, engineers, or all or any of the train men should be changed at Nashua, Lawrence, Manchester, or Concord. The men who run a train on the Concord road, being exclusively the servants of the Concord while engaged in that work, do not go beyond the corporate power of the Concord when they run the same train on the Lowell road as the servants of the Lowell. In the distance of Concord from Boston by way of Nashua; the time of passage by rail between those places; the nature and extent of the public accommodation required on that highway; the public right of using it with economy, speed, and safety; and the private right of the stockholders that it be so used,—there is nothing that raises a presumption of law or fact against its being rightfully and properly operated by one manager, doing work of the Concord company as manager of the Concord, and doing work of the Lowell company as manager of the Lowell. There must be much unity of action in the service due from these companies to the public on this line of highway, and the evidence shows no reason why the ordinary work of such a servant, as a manager, a general ticket agent, an auditor, a cashier, or a pay-master, that is done in the cheapest and most efficient manner, on the Boston & Maine and other lines in several states, by one man, must be done, on this line, by more than one.

In the business connection of May 1, 1882, the Concord company was not " liable for any risk of employés, passengers, or freight, on the local business of " the Lowell company. By an express stipulation of the contract, the Concord confined itself, to that extent, within the bounds of its corporate power. A literal construction of the stipulation would not exclude all the risks of the local business of the Lowell from the Concord's liability. But the evidence is that the manager understood, and acted upon the understanding,

that they were all excluded: and such apparently was the understanding of all parties. The union of risks of accident was an important feature of the partnership contract of August 19, 1881; and the dissolution of the union of accidental losses in local business was an important practical change in management.

But the union of accidental losses in non-local business was not dissolved. In bearing those losses as joint principals, the companies continued an unnecessary community of interest in the business of both. The Concord continued unnecessarily to bear a share of those losses on the Lowell road in exchange for a share of similar losses on the Concord road, unnecessarily borne by the Lowell. A loss happening by accident in the transport of through passengers or through freight on either road, and caused by the sole fault of the company on whose road it happened, was borne by both companies. To this extent, the complainants were unnecessarily made stockholders of both companies. The continuance of this community of interest was a violation of the injunction.

When a loss happens by accident in any business on either road, and there is a doubt to which company the loss belongs, the question can be summarily and properly decided by a competent and duly chosen manager, or other standing adjuster or referee. *Irvin* v. *Nashville &c. R. Co.*, 92 Ill. 103, 108. The law does not require the question to be settled by expensive litigation. No effort or offer has been made to show that there would be an error of law or fact, or any unfairness or unreasonableness, in a general presumption of fact that accidental losses belong to the company on whose road they happen, unless the evidence shows they belong to the other. *Insurance Co.* v. *Railroad Co.*, 104 U. S. 146, 151.

The only ground on which we understand the defendants justify the continuance of the union of through risks is, that they believe it to be a continuance of a part of the business connection in which the roads were operated when one of the complainants was a director of the Concord. It is one of the embarrassing circumstances of the defendants' situation, that they cannot safely rely upon the action of former directors as a legal precedent. The complainants are not estopped to claim that something formerly done by one of them as a director shall not be done by the defendants. The injunction would not be dissolved by proof that the defendants were misled by their confidence in predecessors whose example they followed.

The reasonably convenient public use of the line of highway of which the Concord road is a part necessarily mingles a large part of the earnings of that road with earnings of other roads in a joint fund. The public enjoyment of the public right of transportation creates, among several companies, an extensive community of interest in their private property. It is of great public convenience, if not absolute necessity, that several companies should so combine their operations as to transport passengers and freight over their

roads on one ticket, or other evidence of one contract, and for one price. *N. Lock Co.* v. *W. & N. Railroad Co.*, 48 N. H. 339, 355; *Darling* v *B. & W. R. R. Co.*, 11 Allen 295–297; *Hartan* v. *E. R. Co.*, 114 Mass. 44, 47; *Sussex R. Co.* v. *Morris &c. R. Co.*, 19 N. J. Eq. 13; Brice's Ultra Vires 410 (2d Am. ed.). A large part of the duty of the Concord is its performance of its part of the public service of carrying through passengers and through freight, that is, passengers and freight whose transportation is not wholly performed on the Concord road. Some passengers and some goods are carried over the whole of the main line of the Concord and the Lowell, between Concord and Boston : some over the whole of the Concord and a part of the Lowell; some over the whole of the Lowell and a part of the Concord; and some over a part of each. The gross income of this through business of the two companies is their joint property, to be divided between them by some legal and just rule or computation. A part of it is necessarily received, in the first instance, by the Concord, a part by the Lowell, and a part by other companies. The Concord does not own all it receives: the Lowell does not own all it receives : both of them together do not own all they receive : a part of it belongs to other companies on whose roads through passengers and through freight are carried. Great numbers of people are carried as passengers, and great numbers send and receive property that is carried as freight, by way of the Concord road, on more than one part of the line, between New Hampshire and Massachusetts, and between different towns in Coös, Grafton, Sullivan, Belknap, Merrimack, Hillsborough, and Rockingham. And they are not all compelled to make separate payment to each railroad company of the part of the tolls belonging to it. The division of all such tolls, before they are paid, into the parts which belong to the several companies, and the separate payment of the parts to different companies by each passenger and freight-owner who uses more than one part of the line, would be a grievance to which nobody desires the public should be forced to submit. Such tolls, not divided before they are paid, must be divided afterwards.

Under the Concord and Lowell contract of May 1, 1882, the through and local tolls of these companies were united in one fund, which was divided into tenth parts, of which four were the share of the Concord, and six were the share of the Lowell. It does not appear that the stockholders of the Concord would have any cause to complain of that division if the separate funds of local tolls had not been united with, and included in the division of, the joint fund of through tolls. While the through tolls earned by continuous transportation on through trains on the roads of these companies are a fund that comes into existence as their joint property, the local tolls of the Concord, received by its agents for transportation that begins and ends and is wholly performed on its road, are its separate property. The union of the separate tolls of the

companies created a community of interest in their local business; and their division of those tolls was, to some extent, an exchange. The complainants do not attempt to prove that the union and exchange were, in fact, injurious to them, but they contend they were not authorized by law.

The Concord's separate tolls, when received by its agents, cannot be kept separate from the part of the joint tolls received by the same agents, without inconvenience and expense which it does not appear necessary to incur. But an exact account of the separate tolls can be kept, and an amount exactly equal to them can be taken out and retained as separate property. A part or the whole of the expense of keeping a separate account of them can be saved by including the separate tolls of both companies in the division of their joint tolls. If the Concord's separate fund of local tolls would be entirely wasted by the expense of keeping a separate account of it, stockholders probably would not insist that it should be consumed by book-keeping. If the cost of keeping such an account would so far exceed the value of its use and benefit as to disprove its reasonable necessity for any practical purpose, stockholders probably would not approve the wasteful expense.

"Every railroad corporation shall keep exact accounts of its receipts and expenditures," that will show "when its net receipts exceed the average of 10 per cent. on its expenditures from the commencement of its operations," and the amount of the excess, which is to be "paid into the treasury of the state." G. L., *c.* 158, *s.* 5; *c.* 159, *ss.* 6, 7, 9. The general laws on this subject were enacted after this company was incorporated. Its charter required the directors to make an annual report of receipts and expenditures, some account of which would be necessary under certain provisions of the charter reserving a right of the state to cause the tolls to be so reduced that the net income should not exceed ten per cent., and to buy the road at a price that would allow the company an annual profit of ten per cent. The power of amending the charter was reserved. What that power is, and how far an exercise of it has affected the defendants' duty of keeping accounts, may be material questions. It may be claimed that the books which the company is required, by its charter or other law, to keep, include a detailed account of the local tolls even if the profit of the local business cannot be exactly ascertained because its expense cannot be severed, by precise calculation, from the expense of the through business. If such an account must be kept, however trifling its value, and however disproportionate and unreasonable its cost, it would show the amount of a separate fund of the Concord company. And that fund being in the possession of that company, and its amount being known, it would not be necessarily included in the division of the joint fund with which it is mingled.

In a monthly account, which included all the receipts and nearly all the expenses of both companies, expenses were deducted from

receipts, leaving the balance of net earnings which was divided between them in shares of 4-10 for one, and 6-10 for the other.    The same receipts were also unnecessarily divided into shares of 4-10 and 6-10, and the same expenses were unnecessarily divided into shares of 4-10 and 6-10 which were deducted from the shares of receipts, leaving the net earnings in similar shares.    The superfluous computation seems to have been based on the mistaken idea that, in law, the difference between 4-10 receipts and 4-10 expenses is not 4-10 of the difference between the same receipts and expenses.

The defendants offer to prove that all the trains running on their road between Concord and Nashua are necessarily through trains; that the local business of the road is necessarily done, with its through business, on through trains; that the cost of doing both is necessarily incurred in one mass, which can only be divided by a general estimate; and that neither the net income of the local business, nor the net income of the through business, can be ascertained by mere book-keeping.

In the business connection of May 1, 1882, nearly all the expenses of both companies were joint.    Some were separate.    While a union of some expenses may be reasonably necessary, there may be no necessity for a community of interest in such items as taxes and rents of branch roads.    No evidence is needed to show that public and private convenience and economy require the natural branches of the Concord road to be run as branches, and not as separate roads.    The difficulty is in making the best legal business connection between the Concord and the Lowell companies.    One thing to be found is the most convenient and frugal line of corporate power that can be drawn between their joint and their separate expenses.    The complainants have not tried to find it.    The defendants claim that it depends upon the reasonable necessity of the case, and that the reasonable necessity is a question of fact on which their evidence was excluded by the order limiting the scope of the testimony.    How far they could legally avoid unproductive expense, by a joint expense account, under the contract of May 1, 1882, cannot be decided until evidence is received on the question of reasonable necessity, or that question is shown to be immaterial.

Economical railroad management is a public right.    All the expenses of the Concord company are paid by the public in the form of tolls for transportation; and the lower the expenses, the lower the tolls ought to be.    A considerable part of the grain and other food used in New Hampshire is brought by rail from other states. The prices paid, and the prices received for provisions, clothing, building materials, furniture, machinery, tools, and substantially all movable things, are affected by the rate of railroad tolls, which largely depends upon the rate of railroad expenses.    The public who pay these expenses are more numerous than the tax-payers who pay the cost of maintaining other highways.    All who produce and all who consume are interested that goods should be

carried as cheaply, as conveniently, and as safely as possible.   *N. Lock Co.* v. *W. & N. Railroad,* 48 N. H. 339, 363.   A low rate of railroad tolls being of vital importance to the people, and essential to the prosperity of the state, railway economy is a subject in which not only the stockholders, but the whole community, are deeply concerned.   The stockholders of a road may be less inter- ested in a reduction of its expenses than other classes of people. The stockholders of the Concord company may get the highest legal dividends notwithstanding unnecessary and unreasonable expenses, which ought to be cut off because the public ought not to pay them.   The company is a public servant, operating a piece of highway, and entitled to a reasonable compensation (ascertainable and fixable by due process of law—*McDuffee* v. *P. & R. Rail- road,* 52 N. H. 430, 451) for its public labor, and the public use of the private property invested by the stockholders in the highway. The road being a public road, and the expense of running it being a public expense, it is the right of the public that it be run in the cheapest manner allowed by law and the requirements of the ser- vice in which the company is enlisted; and it is the enforcible duty of the company to so run the road as not to violate the public right of economical management.   If the law requires the road to be managed extravagantly, the law is to be enforced although the excessive expense is a public burden.   But it has not been shown by evidence or argument that the union of expenses, under the contract of May 1, 1882, was either extravagance or illegal economy.

By the former decision the defendants were informed that it was the duty of the Concord company to keep the exclusive con- trol of its road, and to form with the Lowell such a business con- nection as would give the public many of the advantages that would result from a general partnership of the companies.   The partnership which the Concord was forbidden to form, was the partnership which was held in the decision to be beyond its cor- porate power.   What connection was condemned and what con- nection was required by that decision is a question on which eminent counsel, on whose advice this complaint is prosecuted, do not agree with eminent counsel on whose advice the contract com- plained of was made.   The management under that contract was partly legal and partly illegal.

The directors were advised that, by the recission of the contract of August 19, 1881, and the changes made in their management, they fully complied with the injunction.   The evidence is, that in making those changes they acted in good faith, with due care, upon legal advice which they supposed was sound, and with an earnest desire and effort to conform their management to the decision.   The partial failure of their effort not being, in fact, in the slightest degree injurious to the complainants, or any other stockholder, or to the public or any person, the directors cannot justly be subjected to any greater penalty than a nominal fine.

Stock may be bought for such a purpose as to raise a question of the right of the buyer to employ equitable process for an inequitable object.  *Bassett* v. *Salisbury M. Co.*, 47 N. H. 426, 442.  But the complainants, as stockholders whose equitable position as beneficiaries of property held in trust by the corporation is not impeached by the defendants, are entitled to such process as will restrain the action of the trustee within the line of fiduciary power, however harmless or beneficial the transgression of that power may be to the complainants and the public.  A fine of one dollar is imposed on each of the directors.

All concurred.